Filed 6/18/24  In re E.K. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.K. et al., Persons Coming Under the Juvenile Court Law. | |
| | D083385 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. Nos. NJ57474A–B) |
| Plaintiff and Respondent, | |
| v. | |
| J.K., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant, J.K.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

This is the second appeal in this juvenile dependency matter. In the first appeal, we conditionally reversed the juvenile court's orders terminating parental rights to E.K. and D.K. (collectively, the children), for the limited purpose of permitting the Agency to comply with its inquiry obligations under the federal Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq). (*In re E.K.* (Sept. 12, 2023, D082144) [nonpub. opn.] (*E.K. I*).) On remand, the San Diego County Health and Human Services Agency (Agency) conducted additional ICWA inquiries in compliance with our opinion, and the court again found ICWA did not apply. Accordingly, the court reversed its conditional reinstatement of parental rights and terminated them.

Now, J.K. (Father) challenges the juvenile court's orders terminating parental rights.[1] According to Father, the juvenile court prejudicially erred when it found ICWA did not apply to the proceedings, because: (1) the Agency failed to sufficiently provide the family's demographic information to the relevant Native American tribes and the Bureau of Indian Affairs (BIA); and (2) the juvenile court abused its discretion when it denied Father's request for a continuance to await the results of genetic testing. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.

### *Proceedings Prior to Remand*

In May 2021, the Agency petitioned the juvenile court on behalf of the children. (Welf. & Inst. Code,[3] § 300, subd. (b)(1).) The Agency also filed ICWA-010(A) forms indicating the Agency had "reason to believe" the children may be Native American. The Agency's belief was based on R.R.'s (Mother) claim that she had Native American ancestry from the Blackfoot

Tribe in New York. Mother also represented to the juvenile court she was, at one point, a registered member of the Blackfoot Tribe.[4]

In response to Mother's proffers, the Agency e-mailed, mailed, and faxed an "informal inquiry letter" to the Blackfeet Tribe. The Agency received responsive letters from the tribe stating the children were not members of the tribe, eligible for enrollment, or domiciled on their reservation. However, the letters did not indicate if the tribe had evaluated

---

[1]   Father filed four notices of appeal, and we consolidated the appeals. On December 29, 2023, Father appealed the juvenile court's denial of his *Marsden* motion. (*People v. Marsden* (1970) 2 Cal.3d 118.) On January 17, 2024, Father appealed the denial of his second *Marsden* motion, and he filed a separate notice of appeal from the denial of his request to stay the proceedings. On January 30, 2024, Father appealed the juvenile court's orders terminating his parental rights. Father's arguments on appeal relate solely to the juvenile court's orders terminating parental rights, and we deem the appeals that are not addressed in his briefing abandoned. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

[2]   Father's only contentions on appeal concern ICWA, and we limit our discussion of the factual and procedural background accordingly. A more detailed factual and procedural history may be found in our prior opinion. (See *E.K. I, supra*, D082144.)

[3]   Unspecified statutory references are to the Welfare and Institutions Code.

[4]   At times, the record references the "Blackfeet Tribe," and at other times the "Blackfoot Tribe." "[T]here is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe, which is found in Canada and thus not entitled to [ICWA] notice of dependency proceedings." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.) Regardless, "[w]hen Blackfoot heritage is claimed, part of the Agency's duty of inquiry is to clarify whether the parent is actually claiming Blackfoot or Blackfeet heritage so that it can discharge its additional duty to notice the relevant tribes." (*Ibid.*)

whether Mother was eligible for tribal membership, and the Agency failed to provide its initial inquiry letter to the juvenile court.

At the section 366.26 hearing in March 2023, the juvenile court found ICWA did not apply to the proceedings and terminated parental rights. However, the record failed to demonstrate that the Agency or the court had made any ICWA inquiries from Father. Nor did the record establish that the Agency asked any available paternal family members about their potential Native American heritage during the dependency proceedings.

Mother appealed the juvenile court's orders terminating parental rights, and the Agency conceded it had not fulfilled its inquiry obligations under ICWA. We accepted the Agency's concession, conditionally reversed the court's orders, and remanded the matter to the court. We directed the Agency to perform its required inquiries under ICWA and to submit its findings to the juvenile court. If the court found no ICWA notice was required, we ordered the court to reinstate its orders terminating parental rights. (*E.K. I, supra*, D082144.)

## II.

### *Proceedings Following Remand*

Following remand, the juvenile court conditionally reinstated parental rights and reappointed counsel. The court continued the matter to permit the Agency to conduct further ICWA inquiries while the court awaited the remittitur. The Agency then conducted additional interviews with Mother, Father, and various family members, and it sent a supplemental inquiry letter to the Blackfeet Tribe. The Agency reported its findings in addendum reports provided to the court, which we summarize below.

4

A.    *The Children's Maternal Lineage*

In an interview with an Agency social worker, Mother affirmed her claim she was "part of the Blackfoot Tribe out of New York." Mother reported she was attempting to get more information regarding her ancestry through genetic testing. Although the maternal grandmother was deceased, Mother indicated she was attempting to contact her mother's relatives to seek more information about her heritage. When the social worker asked Mother to provide demographic information for the maternal grandmother, Mother declined and referred the social worker to her attorney.

The Agency attempted to contact an individual it believed to be the maternal grandfather at three different phone numbers. Although the social worker left several voicemails, the phone numbers did not appear to be associated with the maternal grandfather, and the social worker was unsuccessful in contacting him. Mother reported she had also been unable to reach the maternal grandfather, and she told the juvenile court that she was unsure if this individual was, in fact, her biological father.

Mother provided a list of her half siblings to the Agency and the juvenile court, but she indicated she did not have their phone numbers because she did not "know them personally." Mother told the court one of her paternal half siblings, Sabrina, believed she had Native American ancestry. An Agency social worker attempted to contact her, but the phone number they believed to be associated with Sabrina was not in service. The Agency then informed the court it did not have any "actionable information" to continue its ICWA investigation with the children's maternal relatives.

B.    *The Agency's Inquiries with the Blackfeet Tribe*

In the Agency's initial letter to the Blackfeet Tribe, it included the demographic information for the children, Mother, and Father. Following

remand, the Agency sent a second inquiry letter to the tribe that also included the maternal grandfather's name. The letter asked the tribe to inform the Agency "whether or not the children and/or their family have any connection" with the Blackfeet Tribe.

The Agency received responsive letters from the Blackfeet Tribe's "ICWA Program" in Browning, Montana.[5] The letters explained the "blood quantum requirement for enrollment is 1/4 Blackfeet Blood." According to the tribe, the children were not listed on the tribal rolls and were not eligible for enrollment. The Agency summarized these findings in an addendum report and provided its inquiry letters to the juvenile court.

C.    *The Children's Paternal Lineage*

The Agency conducted additional ICWA-related interviews with Father. A social worker asked Father whether he had any Native American heritage, and Father responded, "he might, but not sure what it could be." Father stated he was seeking to undergo genealogy testing and was waiting on the arrival of a "DNA kit."

Father also informed the Agency that, "at a family gathering a while ago . . . it was mentioned" that Father's uncle may have "Cherokee heritage, but it's not a sure thing." According to Father, his uncle didn't "even know if he has this heritage—it was just something that was brought up." Although the Agency requested the uncle's contact information from Father and the paternal grandfather, they did not provide it.

Father also sent the Agency images of messages he exchanged with his cousin on "Facebook messenger." In the messages, Father's cousin

---

[5]    An employee with the Office of Tribal Affairs informed the Agency that the Blackfeet Tribe is located in the state of Montana, and there is no federally recognized Blackfeet Tribe in the state of New York.

represented that a genetic test called "23 & Me" revealed she was 12.3 percent "Indigenous American." The test included a note stating she, "most likely had a grandparent, great-grandparent, or second-great-grandparent who was 100 [percent] Indigenous American. This person was likely born between 1860 and 1920." However, the test results did not mention a specific tribe. The Agency requested the cousin's contact information from Father, but he stated his cousin did not want her information to be provided.

The Agency also made ICWA inquiries with a paternal aunt and the paternal grandparents. The paternal grandparents denied any Native American ancestry. The paternal aunt stated she did not believe anyone in her family had Native American ancestry, but she wasn't sure. She reported no one in her family had lived on a reservation, spoke a Native American language, received any financial services or medical care from a tribe, or attended tribal elections or cultural activities.

D.    *The Juvenile Court's Final ICWA Findings and Orders*

After receiving the Agency's addendum reports summarizing its ICWA investigation, Mother and Father twice requested continuances to review the reports and seek more information related to the paternal relatives. The court granted the requests, but at the January 2024 hearing, the court admonished the parties that it would not "wait indefinitely" for the parents' ICWA-related information. The court reminded the parties it had already asked the parents to provide any such information to the Agency. Father informed the court he would provide any additional information to his attorney. However, in a subsequent report, the Agency informed the court the parent's had not "provided additional contact numbers for their relatives."

7

The juvenile court conducted a post-permanency hearing on January 22, 2024, during which it made its final ICWA findings. At the hearing, Father filed a document indicating he had undergone genetic testing, and he requested a 30-day continuance to obtain the test results. The Agency objected to the continuance, arguing the result of the genetic testing would not provide the court with pertinent information to assist in determining whether the children were Native American for the purposes of ICWA. The children's counsel joined the Agency's objection, emphasizing the matter had already been continued several times to allow Mother and Father to provide the Agency with ICWA-related information.

The juvenile court agreed with the Agency that the genetic test results would not be determinative of whether the children were Native American for the purposes of ICWA. The court commented that Father was unable to point to any "direct connection to any federally recognized tribe, and has not provided the name or contact information of a relative that can do so, and is instead hanging [his] hat almost completely on DNA test results, which, again, are not reliable, not a reliable source of information." Consequently, the court denied Father's continuance request.

The juvenile court then addressed the adequacy of the Agency's ICWA inquiries. The court asked the Agency whether notice was ever sent to the BIA, and the Agency's counsel responded they were unaware of whether the BIA had been contacted. But regardless, the Agency argued it had fulfilled its statutory ICWA inquiry obligations as directed by the prior appellate opinion.

The juvenile court found the Agency had "conducted extensive efforts" to speak to the children's relatives regarding potential Native American heritage. The court noted the paternal relatives had refused to provide

8

contact information for available family members, and the Agency could not be expected to interview individuals "for whom no contact information has been provided." The court then found the Agency had conducted adequate ICWA inquiries and that there was no reason to believe ICWA applied to the proceedings. Consequently, the juvenile court reaffirmed its orders terminating parental rights.

DISCUSSION

I.

*The Juvenile Court Did Not Abuse Its Discretion by Denying*

*Father's Request for a Continuance*

Father contends the juvenile court abused its discretion by denying his request to continue the January 22, 2024 hearing. According to Father, the continuance was necessary to allow him to obtain the results of his genetic testing, which "may have provided pertinent information to the Blackfeet and Cherokee tribes' determination of the children's eligibility for membership." Without this information, Father argues the court did not have sufficient information to determine whether ICWA applied to the proceedings. We disagree.

In dependency cases, "[c]ontinuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." (§ 352, subd. (a)(2).) "Courts have interpreted this policy to be an express discouragement of continuances." (*In re Karla C.* (2003) 113 Cal.App.4th 166, 179.) The juvenile court's denial of a continuance request will not be "overturned on appeal absent an abuse of discretion. Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice." (*Ibid.* [cleaned up].)

9

Here, Father's argument that the results of his genetic testing could yield relevant information regarding the children's eligibility for membership in the Blackfeet Tribe is not supported by the record. It was Mother, not Father, who claimed Blackfeet heritage. At the hearing during which parental rights were terminated, Mother's counsel informed the juvenile court that Mother had nothing to add regarding ICWA, and there was no indication in the record she had undergone genetic testing. Accordingly, there is no indication in the record that the results of Father's genetic testing would have had any bearing on the children's potential Blackfeet heritage.

Moreover, in his briefing on appeal, Father avers he told the Agency he "may have Cherokee ancestry," and he claimed "possible Cherokee ancestry." But the record reflects no such affirmative claim of possible Cherokee heritage by Father. In an interview with an Agency social worker, Father stated, "it was mentioned" that his uncle may have Cherokee heritage. However, according to Father, his uncle didn't "even know if he has this heritage—it was just something that was brought up." The paternal grandfather—the uncle's brother—denied any claims of Native American ancestry. When the social worker asked whether *Father* had any Native American heritage, Father responded he might, but he was "not sure what it could be." We do not construe these statements to be affirmative claims of Cherokee ancestry.

However, even assuming Father's statements constituted a claim of Cherokee heritage, the results of his genetic testing would not necessarily

10

determine the children's eligibility for membership in a Cherokee tribe.[6] Under ICWA, a Native American child is a "member of a federally recognized [Native American] tribe, or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4), (8).)" (*In re J.S.* (2021) 62 Cal.App.5th 678, 689 (*J.S.*).) Native American tribes have autonomy in determining eligibility for their membership, and these requirements vary. (*In re K.P.* (2015) 242 Cal.App.4th 1063, 1072.) Accordingly, whether a child is Native American for the purposes of ICWA is "not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized [Native American] Tribe.' " (*J.S.*, at p. 689.)

In *J.S.*, for example, the father in a dependency matter informed the Los Angeles County Department of Children and Family Services (Department) that he "may have" Native American ancestry based on information he learned from the paternal grandmother. (*J.S., supra,* 62 Cal.App.5th at p. 683.) The paternal grandmother told the Department her genetic test results from "ancestry.com" revealed she had " 'approximately 54 [percent] Native American lineage/heritage.' " (*Ibid.*) However, the paternal grandmother also stated she was " 'nearly 100 [percent] certain that none of her relatives/family members have been eligible and/or enrolled in any tribe(s),' " and that her family had moved to the United States from Mexico in 1917. (*Id.* at p. 684.) The juvenile court found this

---

6    The Federal Register lists "three Cherokee entities. Those entities are the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians of North Carolina, and the United Keetoowah Band of Cherokee Indians of Oklahoma. (61 Fed.Reg. 58211 (Nov. 13, 1996).)" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 737.)

information did not provide it with "reason to know" the children were Native American for the purposes of ICWA. (*Ibid.*)

The *J.S.* court affirmed, holding the information provided by the paternal grandmother "had little usefulness in determining" whether the children were Native American children as defined by ICWA. (*J.S., supra*, 62 Cal.App.5th at p. 689.) The paternal grandmother used a genealogy company that included individuals from "North America and South America, '[s]tretching from Alaska to the [t]ip of Argentina' " as part of its classification of the " 'Native American Ethnicity' group." (*Ibid.*) Thus, the genealogy company defined "Native American" in different terms than ICWA and the California statutes implementing ICWA. (*Ibid.*; 25 U.S.C. § 1903(4);§ 224.1, subd. (a).) The court concluded substantial evidence supported the juvenile court's findings that the proffered information did not give it reason to know the children were Native American. (*J.S.*, at p. 690.)

Similarly, here, although Father asserted he "might" have Native American ancestry, he did not provide any information to suggest he was eligible for membership in a federally recognized tribe. Father's claim that someone "mentioned" his uncle may have Cherokee heritage, and his cousin's genealogy test results, both failed to demonstrate the results of his genetic testing would have provided useful information for the determination of the children's eligibility for tribal membership. Accordingly, Father did not provide good cause in support of his request for a continuance. We see no abuse of discretion in the juvenile court's order denying the request, particularly where, as here, the court had already continued the matter several times to permit further ICWA investigation.

12

## II.

*Substantial Evidence Supports the Juvenile Court's Finding*
*That ICWA Did Not Apply to the Proceedings*

Father argues the Agency failed to adequately fulfill its ICWA inquiry obligations, and therefore the juvenile court prejudicially erred in finding ICWA did not apply to the proceedings. He advances three deficiencies in the Agency's investigation: (1) the Agency did not provide the court with copies of its inquiry letters to the Blackfeet Tribe; (2) the Agency did not contact the "Cherokee tribes" to investigate Father's claim that "he may have Cherokee ancestry"; and (3) the Agency failed to contact the BIA. Reviewing the court's ICWA findings for substantial evidence, we affirm. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin J.*) ["We review a court's ICWA findings for substantial evidence."]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 ["We review claims of inadequate inquiry into a child's [Native American] ancestry for substantial evidence."].)

Under the California statutes implementing ICWA, if the Agency has "reason to believe" a child may be Native American, the Agency "shall make *further inquiry* regarding the possible [Native American] status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. subd. (e), italics added.) The Agency's duty of further inquiry includes, but is not limited to, interviewing the children's parents and extended family members; contacting the BIA and State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the children may be eligible for membership; and contacting the relevant tribes and sharing any information necessary for the tribe to make a membership or eligibility determination. (*Id.*, subd. (e)(2)(A)–(C).)

Here, there is no dispute the Agency's duty of further inquiry was triggered by Mother's claims of possible Blackfeet heritage. In our prior decision, we remanded the matter to the juvenile court to permit the Agency to conduct further inquiries consistent with section 224.2, including contacting the Blackfeet Tribe and providing proof of its inquiry to the juvenile court. (See *E.K. I, supra*, D082144.) In his opening brief on appeal, Father claims the Agency failed to provide the court with copies of its inquiry letters sent to the Blackfeet Tribe. Father's claim is directly refuted by the record. The Agency not only provided the juvenile court with its initial inquiry letter sent to the Blackfeet Tribe in 2021, but also its supplement letter sent in 2023 and the tribe's responses. The Agency's letters included the demographic information for Mother, Father, paternal grandfather, and the children, and the tribe's responsive letters indicated that the children were not enrolled in the tribe or eligible for membership.

Moreover, on remand, the Agency conducted several interviews with Mother regarding her claim of Blackfeet heritage, and it attempted to interview Mother's relatives on multiple occasions. Mother did not have contact information for her relatives, and the Agency was unsuccessful in contacting any family members through its own investigative resources. Mother did not provide evidence she was eligible for enrollment in the Blackfeet Tribe, and the tribe expressly stated the children were not eligible for enrollment. Accordingly, we conclude substantial evidence supports the juvenile court's finding that the Agency satisfied its ICWA inquiry obligations regarding the children's maternal lineage.

We also find no merit to Father's argument the Agency erred by failing to contact the BIA. As part of the Agency's duty of further inquiry, it must contact the BIA "for *assistance in identifying the names and contact*

14

*information* of the tribes in which the child may be a member, or eligible for membership in." (§ 224.2, subd. (e)(2)(B), italics added.) Here, Mother claimed Native American heritage via the Blackfeet Tribe, and the record does not suggest the Agency was unable to obtain the name and contact information for the tribe. Just the opposite. The Agency successfully contacted the tribe on two occasions, and the tribe responded to the Agency's inquiries. Accordingly, the Agency's duty of further inquiry did not require it to contact the BIA because it did not need assistance in identifying the name or contact information of the tribe.

Finally, turning to the children's paternal lineage, we conclude Father's proffers to the Agency did not provide reason to believe the children were Native American for the purposes of ICWA. In analyzing Father's claim, we note a split of authority regarding whether a parent's unsupported claim of Native American heritage provides the Agency with reason to believe a child is Native American under ICWA. (Compare *Austin J., supra,* 47 Cal.App.5th at p. 888 with *In re T.G.* (2020) 58 Cal.App.5th 275 (*T.G.*).)

In *Austin J.*, the mother in a dependency proceeding claimed she " 'may have [Native American] ancestry' through a deceased maternal grandmother," and that she had been " 'told that [her] mother had Cherokee [ancestry].' " (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 887–888.) The mother's aunt also indicated that "Mother's maternal grandmother 'may have had Cherokee heritage.' " (*Id.* at p. 878.) On appeal, the *Austin J.* court held these statements were "insufficient to support a reason to believe the children are [Native American] children as defined in ICWA." (*Id.* at p. 888.) The court reasoned that Native American "ancestry, heritage, or blood quantum . . . is not the test; being a [Native American] child requires that the child be either a member of a tribe or a biological child of a member. Being a

15

member of a tribe depends 'on the child's political affiliation with a federally recognized [Native American] Tribe, not the child's ancestry." (*Id.* at pp. 888–889 [cleaned up].) Accordingly, "[i]nformation about a tribal connection that 'is too vague, attenuated and speculative' will not support a 'reason to believe the children might be [Native American] children.' " (*Id.* at p. 888.)

By contrast, in *T.G.*, the court disagreed with *Austin J.'s* conclusion a parent's "express statement" of Native American ancestry, without more, is insufficient to trigger the duty of further inquiry. (*T.G., supra,* 58 Cal.App.5th at p. 294.) There, the Court of Appeal concluded a duty of further inquiry was triggered by: (1) the mother's statements that she believed she had Cherokee ancestry through her maternal family; (2) the mother's claim of possible unknown Native American ancestry through her paternal grandfather; and (3) the maternal grandmother's in-court statements that she had Native American ancestry through the Cherokee Tribe. (*Id.* at p. 292.) Citing to recent legislative amendments to section 224.2, the court reasoned that the "reason to believe" standard should be interpreted broadly because, over time, Native American families may have lost the ability to accurately relate information regarding their eligibility for tribal membership. (*Id.* at pp. 295–296.)

We need not weigh in on this split of authority because the information proffered by Father is insufficient to trigger a duty of further inquiry under either interpretation of the "reason to believe" standard. In *T.G.*, the mother made express statements of possible Cherokee heritage, and the Agency had specific information for known relatives who may have had information regarding the family's Native American ancestry. (*T.G., supra,* 58 Cal.App.5th at p. 292.) By contrast, Father made no such express

16

statement. Instead, he claimed he "might" have Native American ancestry, but he was "not sure what it could be." The Agency investigated Father's claim that someone "mentioned" his uncle may have Cherokee ancestry, and his cousin's claim of 12.3 percent Native American ancestry, by attempting to interview them. The paternal relatives refused to be contacted, and the Agency was not required to "cast about" for information pertaining to relatives who refused to be contacted. (See *In re A.M.* (2020) 47 Cal.App.5th 303, 323 (*A.M.*) ["ICWA does not obligate the court or [the Agency] 'to cast about' for investigative leads."].) Father's statements, without more, were insufficient to support a reason to believe the children were Native American as defined by ICWA—that is, reason to believe the children were members of a tribe or biological children of a tribal member.

In summary, we do not construe Father's statement that he "might" have Native American heritage as sufficient to create a reason to believe the children were Native American for the purposes of ICWA even under the broader standard described in *T.G.*, particularly where, as here, the paternal grandparents both denied Native American ancestry. Accordingly, we conclude substantial evidence supports the juvenile court's findings that the Agency adequately satisfied its ICWA inquiry obligations and that ICWA did not apply to the proceedings. We need not address Father's claim of prejudice because he "has not demonstrated error, and reversal is not warranted under the circumstances of this case." (*A.M., supra,* 47 Cal.App.5th at p. 323.)

## DISPOSITION

The juvenile court's orders are affirmed.

DO, J.

WE CONCUR:

DATO, Acting P. J.

RUBIN, J.